UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEYVIEW LABS, INC. d/b/a
PROCERA HEALTH,

                Plaintiff,

v.                                                     Case No. 8:20-cv-2131-T-36AEP

BENJAMIN BARGER, ICGOLD4ME, LLC,
and GOLD FOR LIFE, LLC d/b/a
FOCUSGOLD, LLC,

                Defendants.
_____/

## REPORT AND RECOMMENDATION

       Plaintiff KeyView Labs, Inc. d/b/a Procera Health's ("KeyView") brought this action against Defendants Benjamin Barger ("Barger"), ICGOLD4ME, LLC ("ICGOLD4ME"), and Gold for Life, LLC d/b/a FocusGold, LLC ("Gold for Life") (collectively, "Defendants"), alleging that Defendants engaged in false advertising and unfair competition under the Lanham Act (Count I), misleading advertising under Florida law (Count II), deceptive and unfair trade practices under the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA") (Count III), and misappropriation of trade secrets under the Florida Uniform Trade Secrets Act ("FUTSA") (Counts IV and V). (Doc. 1). Currently before the court are KeyView's Motion for Preliminary Injunction (Doc. 7) and Defendants' response in opposition thereto. (Doc. 17). With leave, the parties also submitted supplemental briefing and supporting evidence. (Docs. 21, 24, 30-33, 41, 44). The undersigned conducted hearings on the motion on October 14 and November 24, 2020, at which both parties presented oral argument. After consideration, and for the reasons that follow, it is recommended that Plaintiff's Motion for Preliminary Injunction (Doc. 7) be denied.

## I.       Background

KeyView is a nutritional supplement company that manufactures and sells brain health products.  (*See* Doc. 1, ¶¶12-15).  KeyView sells these products under the "Procera Health" brand.  (*Id.*, ¶13).  A "selling point[ ]" for KeyView's products is that they contain "natural ingredients."  (*Id.*, ¶ 15).  Procera, however, uses an ingredient called Vinpocetine, which is apparently synthetically produced.  (*See* Doc. 17-1, ¶57 & Ex. 4; Doc. 21-2, ¶10).  KeyView avers it developed its products by working with Dr. Keith Wesnes, a neuroscientist who passed away in April 2020, and his company, Wesnes Cognition, for over ten years.  (Doc. 1, ¶¶16, 72).

Between 2014 and December 2017, Barger served as KeyView's Vice President of Direct Sales & Marketing.  (Doc. 17-1, ¶17).  Barger had many roles and duties during his tenure at KeyView.  Barger assisted with marketing campaigns.  (*Id.*, ¶47; Doc. 33-1, ¶¶4-5).  Barger also set up telephone numbers at KeyView for returning customers and KeyView's customer service department.  (Doc. 33-1, ¶¶8-9).  Additionally, Barger worked with Dr. Wesnes and Wesnes Cognition on various matters.  (Doc. 25-1, Comp. Ex. 1; Doc. 30-1, ¶¶ 6-9).

One of Barger's principal tasks was developing database algorithms and capabilities for KeyView's customer database.  (*See* Doc. 7, ¶¶19-22).  Barger also recruited the help of his father – a computer engineer – to assist with optimizing KeyView's customer database.  (Doc. 1, ¶48; Doc. 17-2, ¶¶3, 6).  Although KeyView disputes this, during his tenure with KeyView, Barger asserts he did not sign a confidentiality agreement and that KeyView did not mark its customer database as confidential.  (Doc. 1, ¶¶44-45; Doc. 7, ¶¶16-21; Doc. 17-1, ¶¶20-21, 38).  KeyView never requested Barger's father to sign a confidentiality agreement either.  (Doc. 17-2, ¶¶4-5).  Further, nothing in the record indicates that KeyView and Barger entered into non-

competition or non-solicitation agreements.

Nevertheless, KeyView alleges it "has invested substantial amounts of time, money, and manpower to develop its customer database consisting of all customers who have bought KeyView's products[.]"  (Doc. 1, ¶17).  KeyView avers its customer database is the "largest database of brain health buyers" and took roughly ten years to develop.  (*Id.*, ¶¶18-19).  KeyView alleges its customer database contains the "names and ages, detailed contact information, detailed order history, detailed history of returns, product preferences, detailed buying habits and order patterns, including lifetime purchase history, for <u>all</u> KeyView customers."  (*Id.*, ¶21) (emphasis in original).  KeyView also asserts that its customer database "includes detailed 'behavioral data' tailored to each customer, including tips on sales techniques, optimal times and days of the week to place calls, and exact products ordered."  (*Id.*, ¶22).  As a result, KeyView concludes that its customer database constitutes "confidential, proprietary, and trade secret information."  (*Id.*, ¶23).

Defendants, however, dispute KeyView's characterization of its customer database.  As noted by Barger, prospective customer and sales information, including some of KeyView's customer information, is commercially and publicly available for purchase from third-party aggregators and data brokers, which Barger asserts is a relatively common practice in the direct-response marketing industry.  (*See* Doc. 17-1, ¶¶32-39).  Indeed, during Barger's employment, KeyView directly shared customer information with at least one third-party data broker, Macromark, Inc. ("Macromark"), if not more.  (*See* Doc. 17-1, ¶¶32-37; Doc. 17-2; Doc. 21-2, ¶4; Doc. 25-1, Ex. 2; Doc. 30-1, ¶¶18-21; Doc. 33-1, ¶¶21-36 & Ex. 6-10).  Barger asserted that, during his employment, KeyView additionally shared its customer information with third-party data brokers i-Behavior cooperative and Epsilon Abacus & the Abacus Alliance ("Abacus").  (Doc. 30-1, ¶¶18-22).  Scott Eibel ("Eibel"), KeyView's CEO, acknowledged that,

3

as part of and to facilitate Macromark's work for KeyView, KeyView necessarily shared some of its customer information with Macromark, although he asserted that Macromark did not sell or provide access to KeyView's list of active customers to Defendants and that Macromark's prospect lists feature only the prospects' names and addresses not phone numbers.  (Doc. 21-2, ¶4(c) & (d); Doc. 32-2, ¶¶7-8).  Eibel  indicated that KeyView did not have a *direct* relationship with i-Behavior cooperative or Abacus, did not purchase leads *directly* from either entity, and did not send any of its customer data *directly* to either entity, but he admits that Macromark worked with the two entities for work performed on KeyView's behalf and sent KeyView's customer information, including information for some active customers, to those entities to facilitate such work.  (Doc. 32-2, ¶¶5, 10-13; *see* Doc. 32-3, ¶¶5-10).  Steven Carrara ("Carrara"), an employee of Macromark, stated that the information provided to Macromark and then subsequently to i-Behavior consisted of approximately 75,000 direct mail customer records and that Macromark possessed some telephone numbers of KeyView prospects and customers (Doc. 44-1, ¶¶6-9).  Beyond that, KeyView also received prospective customer information from data brokers.  (*See* Doc. 17-1, ¶¶35-40; Doc. 21-2, ¶4(d)(iii); Doc. 30-1, ¶¶15-22; Doc. 32-2, ¶¶7-13; Doc. 32-3, ¶¶2-3; Doc. 33-1, ¶¶22-34 & Ex. 6-10).[1]

Barger resigned from KeyView in December 2017.  (Doc. 1, ¶49).  Pursuant to an employee manual that expressly disclaims any contractual obligation, Barger was directed to return all of KeyView's property upon his resignation.  (*Id.*, ¶50; *see* Doc. 7-1; Doc. 7-2).

---

[1]  Additionally, though not determinative, KeyView acknowledges on its website that it shares customer information with third parties.  *See Terms of Service*, Procera Health, https://procerahealth.com/policies/terms-of-service (last visited Dec. 21, 2020).  According to Eibel, however, the information disclosed to such third parties remains confidential to the third-party vendor, and the third-party vendors are "subject to confidentiality and other restrictions on their permissible use [of] KeyView's customer information – i.e., such information is to be used exclusively in their work for KeyView.  The vendors do not sell, rent, or otherwise share KeyView's data with other third[]parties."  (Doc. 21-2, ¶5(a) & (c)).

According to KeyView, however, Barger improperly retained a copy of its customer database. (Doc. 1, ¶51). Barger emphatically denies retaining or utilizing KeyView's customer database following his resignation in 2017. (Doc. 17-1, ¶¶30-31, 40; Doc. 30-1, ¶13; Doc. 33-1, ¶11). According to Barger, the only documents he retained were some Microsoft Outlook files, which included email information and attachments from Macromark. (Doc. 17-1, ¶¶ 40-42). Those attachments included names of prospect lists that were in the possession of Macromark, a third party. (*Id.*). KeyView permitted Barger to access and store these Outlook files on his personal computer during his employment, and KeyView did not restrict Barger's retention of his historical email accounts. (*Id.*).

Following his resignation from KeyView, Barger worked as the Chief Operating Officer of NES Health, LLC ("NES Health"). (*Id.*, ¶27). Harry Massey ("Massey"), the owner of NES Health, declares that Barger showed him a copy of KeyView's customer database. (*See* Doc. 7-5, ¶¶4-5). Barger disputes this. According to Barger, Massey is mistaken, and Barger actually showed Massey a copy of NES Health's customer database, as an example of Barger's experience with optimizing databases, rather than KeyView's customer database. (*See* Doc. 17-1, ¶¶63-69).

After leaving NES Health, Barger formed Gold for Life in November 2019, but it did not start operating until January 2020. (*Id.*, ¶29). Gold for Life manufactures, sells, and distributes various brain health supplements, such as "Focus Gold," and sports nutrition products. (*Id.*). Gold for Life purchased and utilizes prospect lists available from third-party sources. (*Id.*, ¶44). Gold for Life contacts prospective customers from its purchased lists through direct mail campaigns, telephone marketing efforts, web sales, word of mouth, and referrals. (*See id.*, ¶¶ 32-39, 44).

In March 2020, KeyView learned that Gold for Life had contacted some of KeyView's

customers.  (Doc. 1, ¶52).  Gold for Life continued to contact some of KeyView's customers through August 2020.  (*Id.*, ¶¶53-54).  During this time, KeyView alleges that it was unaware of Barger's involvement with Gold for Life.  (*See id.*, ¶¶53, 57).  In late August 2020, however, KeyView alleges that Gold for Life began "making a concerted effort to contact KeyView customers and making significant false, disparaging, and misleading claims about KeyView and its products."  (*Id.*, ¶55).  KeyView also avers that these phone calls to its customers evidence that Defendants in fact possess a copy of KeyView's customer database.

Many of KeyView's allegations stem from a call by one of Gold for Life's sales representatives, William Steinmetz ("Steinmetz"), to one of KeyView's sales representatives, Diana Schneider ("Schneider"), on August 28, 2020.  (*See id.*, ¶¶57-63, 68-77).  Schneider declares that the 1-800-Number that Steinmetz called is a "test" number and specifically designated to Schneider.  (Doc. 7-4, ¶¶7-15).  This 1-800-Number was included in KeyView's customer database during Barger's employment, and, therefore, KeyView avers this demonstrates that Defendants possess its customer database.  (Doc. 1, ¶58).  Schneider also declares that Steinmetz made false and misleading statements, including: "Procera is being sued due to 'false information'" and "Focus Gold's product was superior because Focus Gold uses 'all natural' ingredients."  (Doc. 7-4, ¶11; *see* Doc. 1, ¶60).  Additionally, Schneider declares that Steinmetz stated Gold for Life "was currently working with Dr. Wesnes and his team to help develop or tests its product."  (Doc. 7-4, ¶12).

Defendants dispute several facts surrounding the context and content of this call.  According to Defendants, the 1-800-Number was neither a "test" number nor a number specifically designated to Schneider.  (*See* Doc. 17-1, ¶¶47-55).  Rather, Barger declares that the 1-800-Number was included in a report provided by Macromark that Barger imported with his Outlook files.  (*Id.*).  Additionally, Barger declares that the 1-800-Number was saved to his

contacts list because it was associated with a marketing campaign during his employment at KeyView. (*Id.*, ¶47). Barger further declares, with supporting documents, that the 1-800-Number was publicly disseminated to thousands of potential customers on direct mailers from KeyView. (*Id.*, ¶¶50-54 & Ex. 3). For his part, Steinmetz declares that he never discussed on the call whether Procera's ingredients are "natural" or that Gold for Life was working with Dr. Wesnes. (Doc. 17-3, ¶¶6-10). Instead, Steinmetz declares he merely noted Barger previously worked with Dr. Wesnes. (*Id.*, ¶9).

In addition to the call to the 1-800-Number, KeyView avers that there have been other phone calls demonstrating that Defendants possess the customer database and made false statements. Mark Thomson ("Thomson"), an account manager at KeyView, states he had several conversations with undisclosed KeyView customers regarding Gold for Life contacting them. (Doc. 7-6, ¶¶7-9). According to Thomson, these undisclosed customers informed him that unspecified sales agents for Gold for Life stated: "KeyView has been sued multiple times for making false claims about its product and is currently being sued for making false claims;" Procera's "products are inferior and do not feature natural ingredients;" and Procera "sold its customer database and customer contact information to Focus Gold." (*Id.*, ¶ 7). Thomson does not provide any detail regarding who made or heard these statements and when exactly these statements were made or heard.

In fact, the only customer offered by KeyView is an undisclosed "Customer Jane Doe # 1." ("Jane Doe") (*See* Doc. 7-7).[2] According to Jane Doe, an unspecified sales agent stated that her "information was in Focus Gold's 'database' and said something to the effect of

---

[2] The Declaration of Jane Doe (Doc. 7-7) was permitted into evidence at the hearing on October 14, but, as stated during the November 24 hearing and as addressed below, the undersigned gives little weight to this evidence because it was provided anonymously, which hindered Defendants' ability to refute the allegations raised therein.

'sometimes companies share or sell customer information to other companies,' which [she] understood as suggesting that Procera Health shared or sold [her] private information and work phone number to Focus Gold." (Doc. 7-7, ¶5). Defendants deny that these statements were ever made. Defendants also claim it is not possible to fairly challenge the statements of a purported witness whose identity is concealed. Finally, Barger declares that Gold for Life's sales scripts do not include any information about KeyView or KeyView's products, including Procera. (Doc. 17-1, ¶45).

On September 10, 2020, KeyView brought this action against Defendants for false and misleading advertising, unfair competition, deceptive and unfair trade practices, and misappropriation of trade secrets. (Doc. 1). Thereafter, KeyView filed its Motion for Preliminary Injunction, which it supported by affidavits and declarations from Schneider, Massey, Thomson, and Jane Doe. (Doc. 7). Subsequently, Defendants submitted their response in opposition with declarations from Barger, Barger's father, and Steinmetz. (Doc. 17). The undersigned conducted a hearing on the motion on October 14, 2020. During the hearing, the undersigned and the parties raised several issues relating to the motion. As a result, the undersigned allowed substantial supplemental briefing and evidence to assist with resolving the motion. (*See* Docs. 21, 24, 25, 30-33, 44).

Namely, KeyView submitted a declaration from Helen Brooker ("Brooker"), an employee of Wesnes Cognition; a declaration from Carrara; and declarations from Eibel. (*See* Docs. 21, 32). Brooker's declaration states that Barger did not work directly with Dr. Wesnes or Wesnes Cognition during his employment with KeyView. (Doc. 21-1). Carrara's declaration indicates that KeyView provided only some of its customer information to Macromark. (*See* Doc. 32-3). Eibel's declaration focus on KeyView's sharing of its customer database with third-party data brokers. (*See* Doc. 21-2; Doc. 32-2). In response, Defendants

submitted two more declarations from Barger, which substantially rebutted the statements made in Brooker, Carrara, and Eibel's declarations with corroborating documentary evidence.  (*See* Doc. 30-1; Doc. 33-1).

KeyView also submitted a second declaration from Schneider.  (*See* Doc. 32-1).  Schneider's second declaration focuses on alleged phone calls to another phone number that belongs to KeyView, (925) 255-2462 (the "925-Number").  According to Schneider, an unspecified Gold for Life sales agent called the 925-Number "several times" and asked to speak with an individual named "Peter."  (*Id.*, ¶¶5-8).  KeyView argues that this alleged use of the name "Peter" indicates the 925-Number was obtained from KeyView's customer database because the database incorrectly matches the 925-Number with an individual named "Peter Dicaro."  Barger's third declaration, however, refutes many of the statements in Schneider's second declaration.  (*See* Doc. 33-1).  Specifically, Barger declares, with supporting documents, that he in fact set up the 925-Number for returning customers and KeyView's customer service department, which resulted in the number being saved in Barger's contacts list.  (*Id.*, ¶¶8-9).  Barger also declares, again with supporting documents, that there was only a single call to the 925-Number – which occurred at the same time that Steinmetz and Schneider had spoken on August 28, 2020 – and the request for "Peter" could not have happened.  (*See id.*, ¶¶13-19 & Ex. 4-5).

On November 24, 2020, the undersigned conducted another hearing on the motion, addressing some preliminary findings and conclusions.  (Doc. 43).  After consideration, the undersigned denied Defendants' motion to dismiss (Doc. 42) and permitted KeyView to submit supplemental authority in support of its motion (Doc. 41).  Accordingly, in response to Barger's third declaration, KeyView submitted evidence of another connected phone call to the 925-Number on August 24, 2020 from Defendants, wherein the conversation requesting "Peter"

*may* have happened, and information regarding the exchange of information between KeyView and Macromark, including that Macromark possessed some phone numbers of KeyView customers and prospects as a KeyView vendor (Doc. 44).

## II.      Legal Standard

The decision to grant or deny a preliminary injunction falls within the discretion of the district court. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (citation omitted); *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  In determining whether a preliminary injunction should issue, the court considers whether the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) irreparable harm to the moving party unless the injunction issues; (3) that the threatened harm to the moving party outweighs the potential harm the proposed injunction may cause the opposing party if the injunction issues; and (4) if issued, the injunction would not disserve or be adverse to the public interest.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  Since a preliminary injunction is an extraordinary and drastic remedy, a court should not issue a preliminary injunction unless the moving party clearly establishes the burden of persuasion as to each of the four prerequisites.  *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir. 2003) (citations omitted).

## III.     Discussion

### A.      Substantial Likelihood of Success

The first and primary factor to consider is whether KeyView can demonstrate a substantial likelihood of success on the merits of its claims.  As noted, KeyView brings claims

against Defendants for false advertising and unfair competition under the Lanham Act (Count I), misleading advertising (Count II), deceptive and unfair trade practices under the FDUTPA (Count III), and misappropriation of trade secrets under the FUTSA (Counts IV and V).  By the instant motion, KeyView seeks an injunction relating to Counts I, III, IV, and V but not as to Count II (Doc. 7).  Accordingly, KeyView must demonstrate that it maintains a substantial likelihood of success on its claims under the Lanham Act, the FDUTPA, and the FUTSA.

### i.    FUTSA Claims

To establish a claim for misappropriation of trade secrets, the plaintiff must establish that "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it."  *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.02).  On this record, KeyView failed to establish a substantial likelihood of success on the merits of its FUTSA claims for two reasons.  Primarily, the record consists of conflicting evidence regarding whether Defendants possess KeyView's customer database.  KeyView contends Defendants possess the customer database; Defendants contend they do not possess it.  The sworn proof submitted by KeyView is in direct contradiction with the sworn proof submitted by Defendants.  For example, Massey declares that Barger showed him a copy of KeyView's customer database.  (*See* Doc. 7-5, ¶¶4-5).  By contrast, Barger declares that Massey is mistaken, and Barger actually showed Massey a copy of NES Health's customer database as an example of Barger's experience with optimizing databases.  (*See* Doc. 17-1, ¶¶63-69).  Additionally, while Schneider declares the 1-800-Number was a closely held, non-public phone number (Doc. 7-4, ¶¶7-8), Barger declares, with supporting evidence, that the 1-800-Number was widely distributed for marketing purposes and

was saved in his personal contacts list.  (*See* Doc. 17-1, ¶¶46-62 & Ex. 3; Doc. 33-1, ¶¶13-19 & Ex. 1).  Barger also declares, with supporting evidence, that the 925-Number was saved independently in his personal contacts list.  (*See* Doc. 33-1, ¶¶3-12 & Ex. 2).

The only evidence submitted by KeyView of Defendants' contacting an external, non-KeyView phone number is Jane Doe's declaration.  (*See* Doc. 7-7).  This declaration, however, is insufficient to satisfy KeyView's burden of establishing a likelihood of success on the merits of its FUTSA claims.  Specifically, Jane Doe's declaration does not reveal either the identity of the customer or the phone number allegedly called by Defendants.  (*See id.*).  Defendants therefore cannot even attempt to contradict or explain the assertions made in Jane Doe's declaration.  "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."  *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).  Defendants' ability to contradict this declaration is especially important because Defendants have already contradicted KeyView's evidence regarding the 1-800-Number and the 925-Number.  As a result, KeyView cannot rely on Jane Doe's declaration to meet its high burden to obtain a preliminary injunction.  *See Doe v. L.A. Unified Sch. Dist.*, No. 2:16-cv-00305-CAS (JEMx), 2017 WL 797152, at *8-9 (C.D. Cal. Feb. 27,2017) (sustaining objection to use of anonymous declarations and noting that "[w]ithout any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under 'penalty of perjury'"); *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 43 (D.D.C. 2014) (noting requirement to "set forth specific facts" in Rule 56 for opposing summary judgment is "not satisfied by an affiant whose identity is not disclosed"); *Or. Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F. Supp. 1255, 1259 (D. Or. 1977) (finding that anonymous affidavits were inappropriate because, although affiants may run risk of harassment and fear, "our system of justice does not contemplate the judicial resolution of disputes based

on secret testimony").

Significantly, KeyView failed to offer typical evidence of trade secret misappropriation, such as electronic records or other internal documentation suggesting removal of customer information and files.  Instead, KeyView exclusively relies upon circumstantial evidence to support its theory that Defendants possess the customer database, which, as noted above, has been heavily contradicted.  *See Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at *4 (S.D. Fla. Feb. 9, 2017) (finding suspicion without "actual *evidence*" of trade secret misappropriation is insufficient for a preliminary injunction); *see also Langford v. Rotech Oxygen & Med. Equip., Inc.*, 541 So.2d 1267, 1268 (Fla. Dist. Ct. App. 1989) (quashing injunction on trade secrets claim because "there was no evidence that [plaintiff] took any customer information lists from [defendant]").  Indeed, Barger repeatedly and vehemently denies, in sworn statements, that he does not and has never possessed KeyView's database. (*See* Doc. 17-1; Doc. 25-1; Doc. 30-1; Doc. 33-1).

Without sufficient proof that Defendants even possess KeyView's customer database, the undersigned cannot determine whether Defendants misappropriated KeyView's customer database.  Indeed, "misappropriation," as defined by the FUTSA, requires proof that the trade secret was obtained through "improper means."  *See* Fla. Stat. § 688.002(2).  In turn, "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Fla. Stat. § 688.002(1).  Here, KeyView provided no evidence of non-competition or non-solicitation agreements between KeyView and Barger, meaning there is nothing preventing Defendants from contacting KeyView's customers.  Barger declares Gold for Life utilized only prospect lists available from third-party sources, and KeyView also admitted it obtained prospective customer information through a prospect list at least once.  (*See* Doc. 17-1, ¶¶30-

44; Doc. 21-2, ¶4(d)(iii)).  Gold for Life's utilization of the same methods as KeyView to obtain prospective customer information would not constitute "misappropriation" as defined by the FUTSA.  *See Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 290 (Fla. Dist. Ct. App. 1989) (explaining an employer may not preclude its former employee from "utilizing contacts and expertise gained during his former employment … or even customer lists he himself developed").  KeyView cannot obtain a preliminary injunction on its FUTSA claims without sufficient proof of a misappropriation.  *See ActivEngage, Inc. v. Smith*, No. 6:19-cv-1638-Orl-37LRH, 2019 WL 5722049, at *5 (M.D. Fla. Nov. 5, 2019) (denying preliminary injunction on FUTSA claims because the plaintiff failed to put forth sufficient evidence of alleged misappropriation).

Second, KeyView failed to establish a substantial likelihood of success in demonstrating its customer database constitutes a trade secret.  KeyView "bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy."  *Del Monte Fresh Produce*, 136 F. Supp. 2d at 1291.  Under Florida law, a "trade secret" includes information, including a compilation, that: "(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain secrecy."  Fla. Stat. § 688.002(4).  Information generally known or readily accessible to third parties cannot qualify for trade secret protection.  *See Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (applying Florida law). "Under Florida law, customer lists are generally considered trade secrets provided: (1) the list was acquired or compiled through the industry of the owner of the list and is not just a compilation of information commonly available to the public; and (2) the owner shows that it

has taken reasonable efforts to maintain the secrecy of the information." *Digital Assurance Certification, LLC v. Pendolino*, No. 6:17-cv-72-Orl-31TBS, 2017 WL 320830, at *2 (M.D. Fla. Jan. 23, 2017).

As noted, KeyView shared customer information – which includes customers' names, phone numbers, and residential addresses – with third parties, including third-party data brokers.  (*See* Doc. 17-1, ¶¶35-40; Doc. 17-2; Doc. 21-2, ¶4; Doc. 30-1, ¶¶15-22; Doc. 32-2, ¶¶7-13; Doc. 32-3, ¶¶2-10; Doc. 33-1, ¶¶22-34 & Ex. 6-10; Doc. 44-1; Doc. 44-2).  KeyView failed to provide any evidence that it entered into any confidentiality agreements with these third-party data brokers or Barger's father, and the evidence is in conflict with respect to whether KeyView entered into a confidentiality agreement with Barger.  (Doc. 1, ¶¶44-45; Doc. 7, ¶¶16-21; Doc. 17-1, ¶¶20-21, 38).   *See Temurian v. Piccolo*, No. 18-cv-62737-BLOOM/Valle, 2019 WL 1763022, at *11 (S.D. Fla. Apr. 22, 2019) (concluding that plaintiffs failed to allege reasonable steps because plaintiffs conceded to giving defendants access to allege trade secrets without a confidentiality agreement).  Conflicts in the evidence also exist as to whether KeyView marked or failed to mark its customer database as confidential.  (Doc. 7, ¶¶16-21; Doc. 17-1, ¶38).  *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300 (11th Cir. 2018) (affirming that customer information was not trade secret because, in part, plaintiff allowed defendant to access information on personal devices and did not have a confidentiality agreement or mark information as confidential).  In fact, while KeyView asserts that the information is shared in a limited capacity with third-party vendors, KeyView's Terms of Service permit sharing of information with third parties beyond KeyView's control. *See Terms of Service*, Procera Health, https://procerahealth.com/policies/terms-of-service (last visited Dec. 21, 2020) ("In arranging to have marketing and promotional information of third-party companies that we think might be of interest to you, we may disclose your personal

information, including information such as your shipping address, billing information, telephone number, and credit card information to nonaffiliated third parties not controlled by KeyView Labs.").

KeyView's sharing of its customer information with third-party data brokers evidences that KeyView failed to take reasonable efforts to maintain the secrecy of its customer database. Although the motion, which is verified by Eibel, originally asserted KeyView's customer information is confidential, not publicly available, password protected, and accessible by only a few KeyView employees (Doc. 7, ¶¶9, 13, 16), Eibel later admitted that KeyView shared some customer information with Macromark, a third party.  (*See* Doc. 21-2, ¶4; Doc. 32-2, ¶8; Doc. 44-2; *see also* Doc. 32-3, ¶5).  Eibel attempts to downplay and explain away the information that was shared with third-party data brokers in his second and third declarations.  (Doc. 32-2; Doc. 44-2).  The emails submitted with Barger's third declaration, however, significantly contradict the statements in Eibel's second declaration.  (*See* Doc. 33-1, Ex. 6, 7). These emails indicate that KeyView shared with Macromark the information for at least 340,000 KeyView customers.  (*See id.*).  Eibel contends that the listed individuals were mostly customers who ordered Procera AVH pursuant to direct mailers sent by Macromark and Procera AVH customers who were difficult to reach through telephone contact or who had otherwise not ordered KeyView's products in more than one year, *i.e.* inactive customers.  (Doc. 44-2, ¶¶7-13).  Regardless, 340,000 customers constitute a large majority of the names in KeyView's customer database.  (*See* Doc. 1, ¶20 ("KeyView's Database currently consists of over 500,000 customers, of which 100,000 customers are currently active ….").  Likewise, KeyView received customer information from third parties, including third-party data brokers.  (*See* Doc. 17-1, ¶¶35-40; Doc. 17-2; Doc. 21-2, ¶4; Doc. 30-1, ¶¶15-22; Doc. 32-2, ¶¶7-13; Doc. 32-3, ¶¶2-10; Doc. 33-1, ¶¶22-34 & Ex. 6-10; Doc. 44-1; Doc. 44-2).  Questions therefore exist as to whether

KeyView's customer list included information originated from publicly available data.  *See Templeton*, 552 So.2d at 289-90; *Harry G. Blackstone, D.O., P.A. v. Dade City Osteopathic Clinic*, 511 So.2d 1050, 1051-52 (Fla. Dist. Ct. App. 1987).

In sum, the record contains conflicting evidence regarding whether Defendants possess KeyView's customer database and whether KeyView's customer database constitutes a trade secret under Florida law.   These factual disputes prevent KeyView from establishing a substantial likelihood of success on the merits of its FUTSA claims.[3]  *See B&G Equip. Co., Inc. v. Airofog USA, LLC*, No. 8:19-cv-403-T-36AEP, 2019 WL 2537792, at *5 (M.D. Fla. June 20, 2019) (adopting report and recommendation denying preliminary injunction because parties' conflicting declarations prevented moving party from establishing substantial likelihood of success on merits); *Ill. Tool Works Inc. v. BG Prods., Inc.*, No. 8:17-cv-420-T-30AAS, 2017 WL 3017214, at *10 (M.D. Fla. June 22, 2017) (denying preliminary injunction because parties' conflicting declarations prevented moving party from establishing substantial likelihood of success on merits), *report and recommendation adopted*, No. 8:17-cv-420-T-30AAS, 2017 WL 2986240 (M.D. Fla. July 13, 2017).

### ii.      Lanham Act and FDUTPA Claims

KeyView's claims under the Lanham Act and the FDUTPA involve similar elements. In fact, the success of the FDUTPA claim is tied to the Lanham Act claim for false advertising. *Sovereign Military Hospitaller Order v. Fla. Priory of the Knights Hospitallers*, 702 F.3d 1279, 1296 (11th Cir. 2012) (citation omitted); *Diamond Resorts Int'l, Inc. v Aaronson*, 371 F. Supp.

---

[3]  The motion also seeks to "[r]emove the content from Defendants' focusgold.com website that uses pictures and names formerly used by KeyView." (Doc. 7, at 25).  While KeyView alleges in its complaint and motion that "Defendants' website, focusgold.com, uses the same photographs and names for its supposed 'customer' testimonials as KeyView's marketing materials," (Doc. 1, ¶76), KeyView failed to offer evidence to support this allegation. Regardless, Defendants' sworn proof refutes such allegation.  (*See* Doc. 17-1, ¶45).

3d 1088, 1115 (M.D. Fla. 2019) (citations omitted).  To establish a likelihood of success on the merits of a false advertising claim under the Lanham Act, "the movant must demonstrate the following: (1) 'the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising.'" *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224 (11th Cir. 2008) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

To recap, in the Complaint, KeyView alleged that Focus Gold's salespeople made the following false statements, among others, to KeyView customers:

- "Procera sold your customer information to us";
- "Procera is a bad company";
- Procera has been sued multiple times for false and misleading claims;
- Procera's products do not really contain natural ingredients; and
- Focus Gold has worked very closely with Dr. Keith Wesnes in developing its product and has an ongoing relationship with Dr. Wesnes's company, Wesnes Cognition.

(Doc. 1, ¶70).  The instant motion, verified by Eibel, indicates that the following statements were made to Defendants' salespeople during Defendants' sales calls:

- "Procera sold your customer information to us";
- "Procera shared your information with us";
- "Procera is a bad company";
- Procera has been sued multiple times for false and misleading claims;
- Procera is currently being sued for false and misleading claims;
- Procera's products do not really contain natural ingredients; and
- Focus Gold has worked very closely with Dr. Keith Wesnes in developing its product and has an ongoing relationship with Dr. Wesnes's company, Wesnes Cognition.

(Doc. 7, ¶38).  Subsequently, in her affidavit submitted in conjunction with the motion, Schneider asserts that a Focus Gold salesperson told her the following during a phone call:

- Like Prevagen, Procera is being sued due to "false information'"

- Focus Gold's product was superior because Focus Gold uses "all natural" ingredients; and
- Focus Gold was currently working with Dr. Wesnes and his team to help develop or test its product.

(Doc. 7-4, ¶¶11-12).  Schneider also asserts that she received calls from customers who told her that they had been contacted by a company selling a memory product named "Focus Gold" and that, before and after the call she personally received, she received calls from KeyView customers reporting false and damaging information they heard from Focus Gold sales calls made to them, including that KeyView "is currently being sued" (Doc. 7-4, ¶¶14, 16).  According to Schneider, KeyView customers also contacted her because they were upset that Focus Gold contacted them on private numbers and expressed concern that KeyView sold their contact information to Focus Gold (Doc. 7-4, ¶17).  Per Schneider, several KeyView customers informed her that they would no longer buy from KeyView because of the statements made to them by Focus Gold salespeople (Doc. 7-4, ¶18).

Additionally, in his affidavit, Thomson asserts that multiple KeyView customers complained about Focus Gold salespersons making the following statements:

- Key View has been sued multiple times for making false claims about its products and is currently being sued for making false claims;
- Procera Health's products are inferior and do not feature natural ingredients; and
- Procera Health sold its customer database and customer contact information to Focus Gold

(Doc. 7-6, ¶7).  According to Thomson, several KeyView customers told him that they were upset by the negative statements made about Procera Health by Focus Gold sales agents and would no longer buy Procera Health products (Doc. 7-6, ¶9).  Further, in her declaration, Jane Doe indicated that a Focus Gold sales agent stated that her information was in Focus Gold's "database" and "something to the effect of 'sometimes companies share or sell customer information to other companies,'" which Jane Doe understood as suggesting that KeyView

shared or sold her private information and work number to Focus Gold (Doc. 7-7, ¶5).  Jane Doe indicated that she was upset by the idea that KeyView might have shared her private information and work phone number with anyone, so she contacted KeyView to ask about whether such sharing had occurred, and a KeyView agent denied sharing or selling her private information or work number (Doc. 7-7, ¶7).

### a.        Whether Statements Were Made

As a threshold matter, a conflict exists in the evidence regarding whether some of the allegedly false or misleading statements were ever made.  Among other things, Schneider declares that Steinmetz stated Focus Gold is "superior" because it uses "all natural" ingredients and that Focus Gold was currently working with Dr. Wesnes.  (*See* Doc. 7-4, ¶¶11-12). Steinmetz, by contrast, denies that these statements were ever made.  (*See* Doc. 17-3, ¶¶7,9; Doc. 17-1, ¶¶56-60).   Schneider's affidavit and Steinmetz's declaration are in direct contradiction.   Neither party has submitted sufficient corroborating evidence to allow the undersigned to determine whose recital of the statements is accurate.

Similarly, a conflict in the evidence exists regarding whether Defendants made the statements, "Procera sold your customer information to us" and "Procera shared your information with us."  Defendants submitted evidence suggesting these statements were not made.  For example, Barger and Steinmetz declare that Gold for Life's sales scripts do not include information about KeyView or its products, including Procera.  (Doc. 17-1, ¶45; Doc. 17-3, ¶3).  Barger further declares that he never instructed Gold for Life's sale agents to comment on KeyView's products.  (Doc. 17-1, ¶8).  Moreover, Steinmetz denies ever discussing customer information or databases during his call with Schneider.  (*See* Doc. 17-3, ¶8).  Additionally, as fully explained above, there is a conflict in the evidence regarding whether Defendants even possess KeyView's customer database.  Defendants aver that they do not

possess or utilize KeyView's customer database but instead purchased and utilized prospect lists available from third-party sources.  (Doc. 17-1, ¶¶43-44).

Furthermore, KeyView failed to submit sufficient evidence to establish that Defendants made the statements regarding Procera selling or sharing customer information.  KeyView relies on Jane Doe's declaration and Thomson's affidavit to establish that these statements were made.  (*See* Doc. 7, ¶38; Doc. 7-6, ¶7; Doc. 7-7, ¶5).  Thomson's affidavit states unspecified, unidentified customers informed him that unspecified "Focus Gold sales agents" stated "Procera Health sold its customer database and customer contact information to Focus Gold." (Doc. 7-6, ¶7(c)).  Although at the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible for a permanent injunction," the evidence must be "'appropriate given the character and objectives of the injunctive proceeding.'"  *Levi Strauss & Co. v. Sunrise Inter. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).  KeyView fails to identify specific times or dates when such statements were made or the names of customers who reported that such statements were made.  Thomson's secondhand recitals of non-detailed events are insufficient to satisfy KeyView's burden of establishing that these comments were in fact made.

The only customer offered by KeyView is Jane Doe (Doc. 7-7, ¶5).  As explained above, however, the undersigned finds Jane Doe's declaration to be of limited probative value.  Even considering Jane Doe's declaration, Jane Doe does not establish that these statements were made or that they were false.  Jane Doe merely declares an unspecified sales agent stated that her "information was in Focus Gold's 'database' and said something to the effect of 'sometimes companies share or sell customer information to other companies,' which I understood as suggesting that Procera Health shared or sold my private information and work phone number

to Focus Gold." (Doc. 7-7, ¶5).  In other words, KeyView relies on what Jane Doe believed the sales agent meant, but not what the sales agent actually said.  And, as noted above, there is evidence demonstrating that companies – including KeyView – in fact "share or sell customer information to other companies."

> **b.**     **Whether Statements Are Non-Actionable Opinion**

The statements regarding the superiority or inferiority of products and whether "Procera is a bad company" are either not actionable or unsupported by the record evidence.  Generally, statements of opinion are not actionable.  *See Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1328 (11th Cir. 2020) (noting statements of opinion are not actionable under the Lanham Act, the FDUTPA, or Florida common law); *see also Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010) ("Statements of opinion are generally not actionable.").   Though generally not actionable, the Eleventh Circuit has suggested that a statement framed as an opinion will be treated as one of fact if the statement fairly implies a factual basis.  *Duty Free Americas, Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (citations omitted).  In this instance, Gold for Life's alleged comments that Focus Gold is a "superior" product or that KeyView's products are "inferior" constitute non-actionable statements of opinion.  *See Osmose*, 612 F.3d at 1311; *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) ("Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability."); *Intertape Polymer Corp. v. Inspired Tech., Inc.*, 725 F. Supp. 2d 1319, 1333 (M.D. Fla. 2010) (indicating that "statements amounting to an opinion or 'puffery' are generally not actionable" under the Lanham Act); *BellSouth Advert. & Pub. Corp. v. Lambert Pub.*, 45 F. Supp. 2d 1316, 1320 (S.D. Ala. 1999) ("Vague or highly subjective claims of product superiority generally will fall within the category of non-actionable puffery.").  Additionally, although KeyView contends that Gold for Life asserted that "Procera

is a bad company," this allegation is not stated in any of KeyView's affidavits.  (*See* Doc. 7, ¶38(c)).  In any case, without more, this statement is, at most, a non-actionable opinion.

### c.      Whether Statements Are False or Misleading

In addition to the conflicting evidence regarding whether the above statements were made and whether the statements are actionable, KeyView failed to establish a substantial likelihood that those statements and others relied upon by KeyView are false or misleading. Under the Lanham Act, an advertisement is false or misleading "if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading."  *1-800 Contacts*, 299 F.3d at 1247.  Determining which category the ad falls into is relevant, as once a court deems the ad to be literally false, the movant need not present evidence of consumer deception, but, if the court finds an ad to be true but misleading, the movant—even at the preliminary injunction stage—must present some evidence of deception.  *Id.*

To establish that the advertisement was false or misleading, a plaintiff must "show that the statements at issue were either (1) commercial claims that are literally false as a factual matter or (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers."  *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (internal quotation marks and citation omitted).  If a plaintiff attempts to establish that the advertisement is literally true but misleading, the plaintiff must demonstrate that consumers were actually deceived.  *1-800 Contacts*, 299 F.3d at 1247.  Namely, the plaintiff must "'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence."  *Hickson Corp.*, 357 F.3d at 1261 (quoting *1-800 Contacts*, 299 F.3d at 1247).  Regardless of which type of falsehood is alleged, determining whether an advertisement is false or misleading requires courts to "analyze the message conveyed in full context" and "view the face of the statement in

23

its entirety." *1-800 Contacts*, 299 F.3d at 1248 (internal quotation marks and citation omitted).

Here, there is evidence demonstrating that not all of Procera's ingredients are natural, as Procera uses an ingredient called Vinpocetine, which is apparently synthetically produced. (*See* Doc. 17-1, ¶57 & Ex. 4).  Indeed, Eibel acknowledged that Vinpocetine is not 100% natural, even though he asserts that it comprises only one ingredient in one of KeyView's products.  (Doc. 21-2, ¶10).  Given that, any statements regarding whether KeyView's products are "natural" are not false or misleading, and, therefore, KeyView cannot establish a substantial likelihood of success based on those statements.

Similarly, the statements regarding whether Barger worked with Dr. Wesnes are not false or misleading.  The evidence shows that Barger in fact previously worked with Dr. Wesnes and his company for multiple years, and these assertions are supported by numerous emails. (*See* Doc. 17-1, ¶59; Doc. 25-1, ¶¶6-11 & Comp. Ex. 1; Doc. 30-1, ¶¶6-11).  Furthermore, there are significant factual issues and disputes with the alleged statements concerning Dr. Wesnes and his company.  Specifically, there is a significant distinction between KeyView's allegations in the Complaint and the statements in the parties' sworn proof.  In the Complaint, KeyView alleges that Gold for Life stated it "*has worked* very closely" with Dr. Wesnes and his company for over ten years in developing Focus Gold.  (Doc. 1, ¶¶62, 70(e), 83(e) (emphasis added)). KeyView also alleges Gold for Life stated it "*has an ongoing relationship* with Dr. Wesnes's company, Wesnes Cognition."  (*Id.*, ¶¶70(e), 83(e) (emphasis added)).  By contrast, Schneider declares that Steinmetz stated Gold for Life "*was currently working* with Dr. Wesnes and his team to help develop or tests its products."  (Doc. 7-4, ¶12 (emphasis added)).  Schneider's statements that Gold for Life is "currently working with Dr. Wesnes" is inconsistent with the Complaint's allegations that Gold for Life stated it "*has worked* very closely" with Dr. Wesnes. Further compounding the confusion, Steinmetz declares he "never stated that Gold for Life *had*

*performed* ten years of clinical research with Dr. Keith Wesnes [or] that Gold for Life *is working* with Dr. Wesnes." (Doc. 17-3, ¶9 (emphasis added)). Steinmetz declares that he merely stated that Barger "*previously worked* with Dr. Wesnes," which appears to be true. (Doc. 17-3, ¶9 (emphasis added); Doc. 25-1, ¶¶6-11 & Comp. Ex. 1; Doc. 30-1, ¶¶6-11).

The distinction between the allegations in the Complaint and the statements in the sworn proof is material because Gold for Life cannot *currently* work with Dr. Wesnes, who passed away in April 2020. By contrast, Barger could have previously worked with Dr. Wesnes and his company. These conflicting allegations and declarations prevent KeyView from establishing a substantial likelihood of success on the merits based on the statements concerning Dr. Wesnes and his company.

Finally, as to the statements regarding KeyView being sued multiple times or currently being sued for making false and misleading claims or due to "false information," such statements are false. As Defendants contend, KeyView has been subject to civil lawsuits and civil enforcement proceedings, including an action brought by the Federal Trade Commission ("FTC") and an action brought for violations of California's Health & Safety Code, which resulted in substantial restrictions regarding the sale of its products in California. (*See* Doc. 17, at 6; Doc. 17-1 at ¶¶22-26, 41-42, 60 & Ex. 2; Doc. 17-3, ¶10; Doc. 17-4); *FTC v. KeyView Labs, Inc.*, Case No. 8:15-cv-01047-CJC-DFM (C.D. Cal. filed on July 1, 2015) (FTC permanent injunction and final judgment entered on July 9, 2015); *Jamara v. KeyView Labs, Inc.*, Case No. 2:18-cv-03040-TLN-CKD (E.D. Cal. filed Nov. 26, 2018) (TCPA Action voluntarily dismissed in January 2019); *Pannell v. KeyView Labs, Inc.*, Case No. 5:18-cv-02508-SL (N.D. Ohio filed Oct. 30, 2018) (TCPA Class Action with an agreed stipulation and order of dismissal entered on June 3, 2019). Though the FTC enforcement action required various submissions for a period of 10 years and released KeyView employees from

confidentiality or other agreements that might limit their cooperation with the FTC, that action concluded in July 2015 and mainly involved KeyView's predecessor.  (*See* Doc. 17-1, Ex. 2, at 15-17; Doc. 21-2, ¶¶6-8).  During the relevant time period, from around March 2020 to the present, KeyView has not been the subject of a lawsuit for false or misleading claims or due to false information, as the last two lawsuits against KeyView involved claims under the Telephone Consumer Protection Act, both of which reached resolution in 2019.  (Doc. 21-2, ¶9); *see Jamara*, Case No. 2:18-cv-03040-TLN-CKD (E.D. Cal. filed Nov. 26, 2018); *see Pannell v*, Case No. 5:18-cv-02508-SL (N.D. Ohio filed Oct. 30, 2018).

Steinmetz and Barger admit that Steinmetz discussed lawsuits involving Procera during the call with Schneider but contend that the discussion only occurred following questions from Schneider regarding whether Procera had been involved in any lawsuits (Doc. 17-1, ¶60; Doc. 17-3, ¶10).  Outside of the statements during the call with Schneider, which Defendants admit occurred, the record does not sufficiently demonstrate that Defendants made the statements to any customers or that such statements had a material effect on any customer's purchasing decisions.  *See Axiom Worldwide*, 522 F.3d at 1224.  KeyView relies primarily upon the affidavit of Thomson, in which he indicates that several KeyView customers told him that Focus Gold salespeople stated that Key View has been sued multiple times for making false claims about its products and is currently being sued for making false claims, those customers were upset by the negative statements made about Procera Health by Focus Gold sales agents, and those customers would no longer buy Procera Health products (Doc. 7-6, ¶¶7, 9).

Notably absent from the record is any affidavit from an actual customer indicating that they were told about litigation involving KeyView.  Where a court deems an advertisement to be literally false, the plaintiff need not present evidence of consumer deception, but, even where a court finds a statement literally false, the plaintiff must establish materiality.  *1-800 Contacts*,

26

299 F.3d at 1247, 1250 (citation omitted).  To establish materiality, KeyView must demonstrate that Defendants' deception is likely to influence the purchasing decision.  *Osmose,* 612 F.3d at 1319 (citation omitted).  There is simply no evidence in the record regarding any influence such statements had or would have on a customer's purchasing decision nor any documented lost sales as a result of such statements.  Indeed, Jane Doe, the only customer providing an affidavit, expressed concern solely regarding whether KeyView shared or sold her private information and work number to Focus Gold (Doc. 7-7, ¶5).  Accordingly, although the statements are false regarding KeyView being sued due to false information or currently being sued or having been sued multiple times for making false claims about its products, no evidence of record supports a finding that the statements had or would have a material effect on any customer's purchasing decisions.  Given that, KeyView cannot demonstrate a likelihood of success on the merits of its claims under the Lanham Act or the FDUTPA.

In sum, there is conflicting evidence regarding whether some of the allegedly false and misleading statements were in fact made, whether they are actionable, whether they are false or misleading, and whether they are material.  Like the FUTSA claims, these factual disputes prevent KeyView from establishing a substantial likelihood of success on the merits of its claims under the Lanham Act and the FDUTPA.  *See Airofog USA, LLC*, 2019 WL 2537792, at *5.  As explained above, numerous factual disputes remain, despite conducting multiple hearings and allowing numerous rounds of briefing.  These factual disputes prevent KeyView from establishing a substantial likelihood of success on the merits, and, as a result, KeyView failed to establish the first element required for issuance of a preliminary injunction.[4]

---

[4]  Typically, where a movant fails to establish a substantial likelihood of success on the merits, the court need not address the other elements required for a preliminary injunction.  *See Warren Pub., Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir. 1997) ("Because we conclude that Warren failed to establish a substantial likelihood of success on the merits, we need not address the additional elements required for a preliminary injunction.").  Since this is

B.      **Irreparable Harm**

As a prerequisite to the entry of a preliminary injunction, the party seeking a preliminary injunction must also establish it will suffer irreparable harm unless the injunction issues.  *See Siegel*, 234 F.3d at 1176.  Even if KeyView could establish a substantial likelihood of success on the merits, the absence of a substantial likelihood of irreparable harm to Plaintiffs, standing alone, precludes entry of a preliminary injunction.  *Id.* ("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").  Indeed, irreparable harm is "the sine qua non of injunctive relief."  *Id.* (citations and quotation marks omitted).

In the context of a preliminary injunction, the asserted irreparable harm must be actual and imminent rather than remote or speculative.  *Id.*; *see also Stewart Agency, Inc. v. Arrigo Enter., Inc.*, 266 So.3d 207, 214 (Fla. Dist. Ct. App. 2019) (citation omitted) (indicating that, for a claimant to be aggrieved under the FDUTPA, the injury claimed to have been suffered cannot be merely speculative).  Harm is "irreparable" only where it cannot be undone through monetary remedies.  *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).  Here, KeyView fails to demonstrate that it will suffer any harm if an injunction is not issued, much less that such harm is irreparable.  Interestingly, outside of Jane Doe, KeyView fails to point to a single customer or sale lost or diverted to Defendants or any damage to its reputation or brand caused by Defendants' statements.  Notably, in his declaration, Eibel indicated that he could identify at least 24 customers who contacted KeyView to complain about Defendants' contacting them (Doc. 21-2, ¶4(d)(i) & (iii)), yet not a single affidavit or declaration appears

_____

a report and recommendation, however, the undersigned will address the other three factors in turn.

from one of those customers.  Rather, KeyView relies upon the statements from Jane Doe, which lack probative value, and upon secondhand statements from Schneider and Thomson regarding purported disgruntled KeyView customers, who were either concerned or upset about statements from Defendants or indicated that they would no longer buy KeyView's products as a result of statements from Defendants.  (Doc. 7-4, ¶¶17-18; Doc. 7-6, ¶9; Doc. 7-7).  As noted, although at the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible for a permanent injunction, the evidence must be appropriate given the character and objectives of the injunctive proceeding.  *Levi Strauss & Co.*, 51 F.3d at 985 (internal quotation and citation omitted).  KeyView's attenuated evidence simply does not warrant a finding that irreparable harm will occur absent issuance of an injunction.[5]  Based on the foregoing, KeyView failed to demonstrate that it will suffer irreparable harm, and, thus, this prong of the analysis also does not support entry of a preliminary injunction.

### C.    Balance of Harm

A party seeking a preliminary injunction must further demonstrate that the threatened harm to it outweighs the harm a preliminary injunction may cause to the opposing party.  *Siegel*, 234 F.3d at 1176.  As the Eleventh Circuit cautions, courts should exercise great care before the entire case has been fully and fairly heard to assure that the power of the court to require or deter action does not result in unwarranted harm to the defendant or the public.  *Ala. v. U.S.*

---

[5]  On this record, the only potentially actionable statements are the ones discussing KeyView being sued for false or misleading statements or due to false information.  The fact that those statements are false does not create a presumption of irreparable harm.  "Proof of falsity is generally only sufficient to sustain a finding of irreparable injury when the false statement is made in the context of comparative advertising between the plaintiff's and defendant's products." *Axiom Worldwide*, 522 F.3d at 1227 (citation omitted).  As the statements regarding purported litigation involving KeyView does not involve any comparative advertising between KeyView's and Defendants' products, the presumption of irreparable harm does not arise.

*Army Corps of Eng'r*, 424 F.3d 1117, 1128 (11th Cir. 2005).  Comparing the harm suffered by the parties in this instance, the balance of harm tips in favor of Defendants.  In a conclusory fashion, KeyView asserts that the "balance of hardships tips decisively in KeyView's favor" as "Defendants cannot legitimately claim that they will suffer harm if an injunction is entered because such injunction would merely prohibit them from using misappropriated trade secrets, from unlawfully disparaging KeyView, and from engaging in unfair competition."  (Doc. 7, at 20).  Given the foregoing, however, such a finding is not warranted.  KeyView failed to demonstrate that it maintains a substantial likelihood of success regarding whether Defendants misappropriated trade secrets, unlawfully disparaged KeyView, or engaged in unfair competition.  Notwithstanding, KeyView requests extensive injunctive relief against Defendants (Doc. 7, at 23-25), essentially preventing Defendants from contacting potential customers and engaging in fair competition with KeyView.  Granting the requested injunctive relief would effectively prohibit Defendants from engaging in lawful, competitive activities based upon evidence that is, at best, questionable or, at the very least, in conflict.  As such, the balance of harm weighs against entry of a preliminary injunction.  For that reason, a preliminary injunction should not issue.

### D.    Public Interest

Finally, Plaintiffs must demonstrate that the preliminary injunction would not disserve or be adverse to the public interest.  *Siegel*, 234 F.3d at 1176.  The goals of preventing customer confusion or deception would not be served because questions remain as to whether Defendants possess or utilize KeyView's customer database and whether the alleged false and misleading statements were made, whether they are actionable, and whether they are, in fact, false or misleading or materially affect customer decisions.  Further, as KeyView did not enter into a non-competition or non-solicitation agreement with Barger, entry of a preliminary injunction

would not serve the public interest in enforcement of contracts.  Nor would the public interest be served by stifling competition.  Rather, restricting Defendants' ability to lawfully solicit customers and compete with KeyView would prove adverse to the public interest in free and fair competition.  Accordingly, the public interest considerations weigh against entry of a preliminary injunction.

**IV.    Conclusion**

For the foregoing reasons, it is hereby

RECOMMENDED:

1.    Plaintiff's Motion for Preliminary Injunction (Doc. 7) be denied.

IT IS SO REPORTED in Tampa, Florida, this 22nd day of December, 2020.

ANTHONY E. PORCELLI
United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.  28 U.S.C. § 636(b)(1)(C).  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

cc:    Hon. Charlene E. Honeywell
       Counsel of Record